UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

OBIPEKTIN AG,                                                          PLAINTIFF

v.                                                    CIVIL ACTION NO. 3:08-CV-380-S

FALKON INTERNATIONAL, INC., et al.,                                  DEFENDANTS

## **MEMORANDUM OPINION**

This case is before the court on the summary judgment motion of plaintiff Obipektin AG, a Swiss supplier of various specialty food ingredients. Obipektin has sued a number of former American business associates to recover funds it claims it is owed by a now-insolvent company, Spreda USA, Inc. To get at the assets of these other entities—who have no obligations to Obipektin in their own names—the plaintiff argues that Spreda USA's corporate veil should be pierced or, in the alternative, that the Spreda USA fraudulently conveyed virtually all of its assets to the defendants, and that such transfers should be treated as void. For the reasons that follow, plaintiff's motion for summary judgment will be granted in part and denied in part.

## **I.**

The factual background to this case is somewhat opaque, owing to the fact that the controlling contracts were never set down in writing. Obipektin wholly owned a second Swiss company, Spreda AG.[1] Obipektin sought entrée into the American market for its food ingredients, and in 1985 entered into a verbal marketing agreement with defendant Vero Industries, Inc., which

---

[1] Although Spreda AG is technically a separate company, Obipektin is the named party in this case and the two entities are for practical purposes identical. For purposes of clarity, we will therefore refer to Obipektin and Spreda AG together as "Obipektin."

marketed and distributed dried fruits and vegetables in the United States.[2] Vero's owner and president, defendant George Falk,[3] also owned and presided over defendant Falkon International, Inc., a company that served a number of functions, including ownership of horses and operation of a farm. In order to facilitate sales of Spreda AG products in the United States, Falk incorporated Spreda USA in 1985. Though this new firm was owned by Falk and not Obipektin, the name was chosen (with Obipektin's consent) so that Falk could take advantage of the Spreda brand name in selling Obipektin's products in America.

The agreement between Vero and Obipektin was never reduced to writing. Vero was compensated on a commission basis, but sometime in the 1990s the commission rate was reduced in the face of declining sales and profitability. Vero's lost income from this agreement was to be made up by Obipektin in the form of higher future commissions, but this increase evidently never occurred.

Vero eventually assigned its responsibilities in marketing Obipektin products to Falkon. Falkon and Obipektin agreed that Falkon would be guaranteed (in addition to operating expenses) a minimum of $10,000 per month, with commissions paid if they exceeded that amount. This arrangement continued until August 2006, when Obipektin terminated its business relationship with Falk and his companies.

Along the way, Spreda USA racked up hundreds of thousands of dollars in debt to Obipektin, and on February 12, 2007, a Kentucky state court entered an agreed judgment against Spreda USA

---

[2] Vero Industries has since changed its name to Vero International, Inc. The two names are listed as separate entries on the full case caption, but they in fact describe the same entity.

[3] George Falk is now deceased. He has been replaced as party by his estate, but for simplicity's sake we use his name throughout this opinion.

for $974,860.10, plus interest. Spreda USA has not paid this judgment, and according to the plaintiffs' calculations, the debt has now risen to $1,305,221.58.

Between January 2005 and March 2007 (while it was in debt to Obipektin), Spreda USA transferred large sums of money to several of the defendants in this case. Specifically, Spreda USA allegedly sent $592,642.06 to Falkon, $18,916.68 to Vero, and $47,900.00 to James Falk (George Falk's son). Obipektin challenges the validity of these transfers. By September 30, 2007 Spreda USA's bank account balance sat at $27.57, leaving it obviously unable to satisfy the judgment against it. Unable to collect, Obipektin brought this suit and now has moves for summary judgment.

## II.

A party moving for summary judgment has the burden of showing that there are no genuine issues of material fact and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in the

light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Sitting in diversity, the Court will apply Kentucky law to resolve the questions at hand. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008) *(citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

## III.

The plaintiff's simplest avenue of relief is KRS 378.020, which provides:

> Every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void as to all his then existing creditors, but shall not, on that account alone, be void as to creditors whose claims are thereafter contracted, nor as to purchasers from the debtor with notice of the voluntary alienation or charge.

This section does not require proof of fraudulent or wrongful intent. *Madison Capital Co. v. Smith*, 2009 U.S. Dist. LEXIS 14690, at *10 (W.D. Ky. Feb. 24, 2009) *(citing Combs v. Poulos*, 241 Ky. 617, 44 S.W.2d 571 (1931)). Its purpose is to place creditors back in the same position they enjoyed prior to any voidable conveyance. *Id.* (*citing Mattingly v. Gentry*, 419 S.W.2d 745 (Ky. 1967)). The statute requires only proof of three objective elements: (1) that the defendant transferred or conveyed assets; (2) that at the time of the transfer, the defendant owed a debt to the plaintiff; (3) that the transfer was not matched by valuable consideration. In the event a transaction is determined to be void under this statute, the appropriate remedy appears to be judgment against the recipient of the transfer. *See id.* at *13 ("[Plaintiff] argues that the only proper remedy under KRS 378.020 in these circumstances is a money judgment against [the defendant-transferee] in the amount of the fraudulent transfer. At this time, the Court cannot find authority to the contrary.").

Conceding that Spreda USA transferred several hundred thousand dollars to them while it was in debt to Obipektin, defendants argue that many of those transfers were nonetheless valid because they were supported by consideration.[4] These transfers consist of $62,842.06 paid in eight checks to Falkon and $12,738 paid in three checks to Vero. With respect to these eleven transfers, there is at least sufficient evidence, in the form of James Falk's affidavit and supporting documents, to create a genuine question of fact as to whether consideration was supplied. The checks appear to have been reimbursement or compensation to the defendant companies for goods purchased and sold on Spreda USA's behalf. Consequently summary judgment is not appropriate on this ground.

Plaintiff has also challenged $47,600 that Spreda USA paid James Falk. The defense characterizes $27,500 of that amount as an unrepaid (and also, as it happens, unsecured) loan, but that is only to say that it was a transfer given without consideration. It follows that the "loan" was an invalid transfer, and that judgment is appropriate at this time against James Falk in its amount.

With respect to the $20,100 remaining payment to James Falk, the defense contends that Spreda USA paid him that money as compensation for marketing and administrative work performed on Spreda USA's behalf. (*See* James Falk Aff. ¶ 17.) This claim is adequately supported, we think, to get past summary judgment.

That leaves $529,800 in transfers from Spreda USA to Falkon unaccounted-for. Of that amount, Falkon asserts that it was owed (it does not say by whom) $190,000 for 19 months (running

---

[4] Plaintiffs include in their exhibits a $6,178.68 check from RC Fine Foods, Inc. to Vero Industries, but do not discuss how it constitutes a transfer of any sort from Spreda USA. Consequently the court is inclined to think it is irrelevant to the current action and will grant summary judgment *sua sponte* to the defense with respect to any claims arising out of that check.

from January 2005 through July 2006[5]) of minimum $10,000 monthly commissions. (Resp. 10.) There is no evidence to support the claim that anyone owed Falkon this sum, and anyway this explanation fails to show that there was any consideration behind the transfers. According to the defendants' own account, Obipektin's agreement was with Vero and, later, with Falkon. (*See* Br. for Defs. 2-3; James Falk Aff ¶ 8 (discussing the "marketing agreement between Vero International, Inc. and Obipektin/Spreda AG").) Spreda USA was a mere instrumentality, owned by the Falk, that he used to effectuate the Vero-Falkcon-Obipektin marketing agreement. Any commission fees that the defendants were due to collect can only have been owed by Obipektin. The record contains no record of a contract under which Spreda USA would owe Falkon commission fees, or any money at all. Thus for Falkon to have collected its fees from Spreda USA was for it to have collected money to which it had no right, and for which it furnished no consideration. Any money that Falkon could properly have collected was in Obipektin's pockets, not Spreda USA's. Consequently the transfer was void and judgment against Falkon for that sum is warranted.

Falkon mounts an even less-persuasive defense of the remaining $339,800 in transfers it received from Spreda USA. Evidently George Falk (as president of both Falkon and Spreda USA) "believed" that Falkon was due this sum "because of lost business opportunities and unrecouped commissions directly resulting from the conduct of the Plaintiff." (Br. for Defs. 10.) He further "believed" that "those transfers were based upon valid consideration." (*Id.*) But those beliefs are entirely orthogonal[6] to the cause of action asserted here, which asks only if there was actual

---

[5] The defense brief cites August 2006 as the end date, but because (a) the parties' relationship ended effective August 1, 2006, and (b) counting August would mean a 20-month period, July seems to be the correct month for counting purposes.

[6] *See* Transcript of Oral Argument at 24-25, *Briscoe v. Virginia*, 559 U.S. ___ (2010) (No.
(continued...)

consideration to justify the transfers. If Falk believed that Obipektin owed Falkon money, or had cost it business, he had tort and contract causes of action against it and could have brought them in an appropriate court of law. Falkon was not entitled to take money from one entity (Spreda USA) on the ground that another (Obipektin) owed it money. Regardless of what Falk thought, believed, or felt, there was no consideration for those conveyances, and they are therefore void. Plaintiff is entitled to summary judgment here as well.

We see no need to address the issue (presented in Count I of the complaint), whether the above transfers were fraudulent under KRS 378.010. That provision voids transfers made by a debtor "with the intent to delay, hinder or defraud creditors, purchasers or other persons." For the reasons explained above, much of the money in question is recoverable under KRS 378.020, and with respect to those sums it would be pointless to dive into the murky question of whether a now-deceased individual had the subjective intent to defraud his creditors. The transfers with respect to which we denied summary judgment above appear to be supported by valid consideration, and therefore appear not to have been fraudulent. Consequently summary judgment is not appropriate under this statute either.

Plaintiff has produced no argument and no apparent evidence in support of Count III of the complaint, which invokes KRS 378.060 ("Preferential conveyance, encumbrance or other act in contemplation of insolvency"). Consequently we will grant summary judgment *sua sponte* to the defense as to that count. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence

_____

[6](...continued)
07-11191), http://www.supremecourtus.gov/oral_arguments/argument_transcripts/07-11191.pdf.

of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

## IV.

The remainder of the complaint seeks to "pierce the corporate veil" in order to hold Falkon, Vero, and George Falk liable on the state-court judgment against Spreda USA. We first note that piercing the corporate veil is not a cause of action in and of itself; it is a means by which a creditor can impose liability on someone other than the party who is actually responsible. *See* 1 Fletcher Cyclopedia of the Law of Private Corporations § 41.10 (Perm. ed. 1999) ("A finding of fact of alter ego, standing alone, creates no cause of action. It merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation."). Thus the cause of action asserted here is not "piercing the corporate veil," but rather the enforcement of a prior judgment against Spreda USA. We are required to enforce valid state-court judgments. 28 U.S.C. § 1738. While the record does not seem to contain a copy of the judgment itself, defendants do not contest its existence, its amount, or plaintiff's calculation of the interest and total sum owed. We therefore assume that Spreda USA owes the entire $1,305,221.58.

Under Kentucky law, the corporate veil should be pierced only "reluctantly and cautiously." *White v. Winchester Land Development Corp.*, 584 S.W.2d 56, 62 (Ky. App. 1979). Furthermore, the underlying debts in this action are (so far as the court can tell) contractual rather than tortious in origin. This is important because, in a contract case, "unless the corporation engaged in some practice that might have misled its contract creditors into thinking they were dealing with another entity, there simply is no need to 'protect' them. Unlike tort claimants, they chose to deal with the

corporation; to allow them access to shareholders or parent corporations when the deal goes sour is to give them more than the benefit of their bargain." *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 415-16 (7th Cir. 1988) (Easterbrook, J.); *cf. White*, 584 S.W.2d at 61 ("[T]he bank's loss was not unjust because it could have secured the loan . . . merely by requiring the Whites to sign those notes in their individual and separate capacities.").[7]

The leading Kentucky veil-piercing case discusses three tests: the instrumentality theory, the alter ego theory, and the equity formulation. *White*, 584 S.W.2d at 61 (*citing* Rutheford B. Campbell, Corporate Shareholders: Myth or Matter-of-Fact, 63 Ky. L.J. 23, 33 (1975)). Obipektin relies only on the equity formulation, which instructs a court to bear in mind "the innumerable equities of each case" before focusing on five factors: "(1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4) a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities." *Id.* at 62 (*citing* 1 Fletcher, *supra*, at § 41). However, because equity cases "do not lend themselves to strict rules and prima facie cases," *id.*, a court need not find all five factors in order to ignore the corporate form and hold its shareholders liable. *See United States v. WRW Corp.*, 778 F. Supp. 919, 924 (E.D. Ky. 1991), *aff'd*, 986 F.2d 138 (6th Cir. 1993) (finding no evidence of siphoning but imposing liability where the remaining factors were present). Obipektin concedes that it has no evidence that Spreda USA engaged in questionable

---

[7] We also observe that for Obipektin to get at the assets of either Vero or Falkon, it must prove its case twice or even three times. The debt to be enforced belongs to Spreda USA, in which neither Vero nor Falkon has any ownership interest. Thus piercing Spreda USA's veil would only gain the plaintiff access to the assets of George Falk, as sole stockholder. Falk's other companies have separate corporate existences and would not normally be held liable on the debts of its principal. To proceed against them, Obipektin must convince the court that their corporate forms should be ignored as well.

dividends practices or that anyone guaranteed its debts, and therefore emphasizes the other three factors.

"'Inadequate capitalization' generally means capitalization very small in relation to the nature of the business of the corporation and the risks attendant to such businesses." 1 Fletcher, *supra*, at § 41.33. *See also WRW Corp.*, 778 F. Supp. at 923 (finding corporation's capital inadequate to undertake an expensive and highly regulated coal-mining operation). "[T]he significance of undercapitalization lies in 'the policy . . . to protect innocent third parties who had no way of knowing that they were dealing with an impecunious entity.'" *Louisville/Jefferson County Metro Gov't v. Hornblower Marine Servs.*, 2009 U.S. Dist. LEXIS 92351 at *15 (W.D. Ky. Oct. 1, 2009) (*quoting White*, 584 S.W.2d at 62). Where a plaintiff knew with whom it was dealing and was not deceived about the debtor corporation's identity, assets, or income, undercapitalization is less significant a consideration. Equity does not normally favor providing a party with more than the benefit of his bargain; it will not supply a party with security where that party simply failed to negotiate for it.

Here, it is uncontested that Spreda USA "never had any assets"; it existed only "on paper." (George Falk Aff. 8.) It was set up for the purpose of allowing Falk to do business under the Spreda name, in order to lend him an air of authority in selling Spreda AG's products. It did have its own bank account and at various times held significant quantities of cash, but as discussed above most of those reserves were transferred to James Falk, Vero, and Falkon between January 2005 and September 2007, leaving the firm with only $27.57 to its name. In the face of the hundreds of thousands of dollars of debt that Spreda USA already faced at that time, holding so little cash and no other assets would seem to tilt the scales in favor of piercing its veil.

There are, however, serious problems with this apparently simple line of argument. First, there was nothing secret or misleading about Spreda USA's existence, ownership, or purpose. Falk created the firm with Obipektin's blessing, and the parties had a long and intimate business relationship. It is hard to see how Obipektin could have been unaware of the nature of the operation, and it certainly knew of Spreda USA's large debt and its continuing failure to pay it. The genesis of the debt to Obipektin is not entirely clear, but it appears to have arisen out of contracts and business arrangements that could easily have been structured to secure Obipektin against the possibility of Spreda USA's insolvency. George Falk indicated in his deposition that Obipektin never imposed a limit on the credit it would extend to Spreda USA, thus allowing a business with no real assets to rack up the huge debt that is the subject of this litigation. (George Falk Depo. 38.) Further, Obipektin never attempted to secure itself by shipping its goods under letters of credit, though it could have chosen to do so. (*Id.*) This is simply not a case where the plaintiff did not know it was dealing with an impecunious entity and could not have protected itself.

It is also worth noting that Spreda USA became undercapitalized because of the transactions discussed above, which amounted to several hundred thousand dollars but which we have now declared void. That cash should rightfully still be in Spreda USA's coffers, and if it were the firm could not be called undercapitalized. Obipektin has another avenue through which it can recover those funds, leaving it situated as though it could recover them from Spreda USA itself. To allow it to pierce the veil would be to allow it access to all of George Falk's assets, and potentially all of Falkon's and Vero's as well—a result that seems improper in light of the fact that Obipektin could have secured itself against loss but failed to do so. With all this in mind, Spreda USA's apparent undercapitalization is far less significant than the plaintiff would have us believe.

Turning to the second factor: A corporation's failure to fulfill the requirements that the state places upon it weighs in favor of declining to honor the limit on liability that the state provides in return. *See White*, 584 S.W. 2d at 62. Under this rubric, courts consider formalities including stock issuance, fiscal separateness of the shareholders and the corporation, and the observance of proper meeting and record-keeping procedure. *See WRW Corp.*, 778 F.Supp. at 923-24. Spreda USA observed at least some corporate formalities, though George Falk appears to have been the sole stockholder and officer. For over 20 years it was a corporation in good standing in Kentucky, and it maintained a separate bank account. However, there is some evidence that Falk habitually blurred the lines between his companies and himself. Falk's travel expenses while working for Spreda USA were paid by Falkon, though it is not clear that there was any contract between the corporations that would call for that expenditure. (Perhaps Falk formed such a contract between his companies in his mind, but that hardly counts as an observance of corporate formalities.) And after Spreda USA had stopped doing business in August 2006 (it had not been dissolved, but its relationship with Obipektin and Spreda AG had ceased), its account financed travel expenses related to Vero. Outside of these few, relatively small inter-company expenditures, however, plaintiff is unable to point to any serious evidence that Spreda USA neglected the requirements of the corporate form. In a case where the plaintiff, through long familiarity with the debtor company, surely knew how it operated and declined to require strict adherence to the law and legal guarantees of its debt, these relatively minor failings do not counsel strongly in the direction of piercing Spreda USA's veil.

On the question of siphoning, the plaintiffs make their strongest case. For reasons explained above, Spreda transferred large sums of money to its sister companies without apparent justification. However, we have now declared those transfers void, and the plaintiff will therefore be able to

recover any siphoned funds to the extent that it has a right to them. In light of this fact, and the fact that the other factors weigh only slightly (if at all) in favor of piercing Spreda USA's veil, we cannot conclude that Obipektin has carried its heavy burden. Summary judgment is therefore inappropriate on this issue.

The court will issue a separate order in accordance with this opinion.

Charles R. Simpson III, Judge
United States District Court

January 29, 2010